FeeemAN, J.,
also dissented, and said the complainant comes too late. She has ratified the act of receiving the money by her agent, and can not now after the *638 money has become worthless, ask to have contract set aside.
The principle of the case of Knuckolls v. Lea, I think conclusive of the case. In that case the Court say, “the complainant comes too late; he should have sought this remedy as soon as he ascertained that it was needed for the effectuation of justice to himself. He has waited until the property has become materially deteriorated in value, that Lea can not be put at all in the position he occupied before the sale: ” Knuckolls v. Lea, 10 Hum.; 7 Hum., 586.
Here the Confederate money has become worthless— and that in complainant’s hands — or rather in the hands of a party to whom it was loaned by her agent.
We held in a case at Nashville, at last term, Hamilton v. Saunders, that a party could not be permitted to retain Confederate money — never tender it back, after knowledge of fraud, or even in case of duress, after the duress was removed, for several years— speculate upon the chances of the success of the Confederacy, and then after the money was found to be worthless, come and insist on rescission of the contract; but that such party must in reasonable time, rescind the contract, or offer to do so, and return or offer to return the consideration received.
If this principle was sound in that case, it is conclusive of this, we think, because here the party had full and complete knowledge of all the facts of fraud, and of violation of authority on part of agent in receiving the Confederate money, from the day he presented it to her, a few days after the trade.
*639 But is uot her conduct a ratification, not only by long acquiescence in the receipt of the money by her agent, but by' affirmative action on her part?
In case of Knuckolls v. Lea, it was held, that the fact that Knuokolls had sold the mills purchased by Lea, though he • had afterward procured reconveyances to himself, was an express ratification of the contract, although it was alleged to have been obtained by gross fraud. He had dealt with the property as his own, after knowledge of the fraud, is the principle of the case, and this has always been held a ratification, I think.
In this case, Miss Scott, when she learned the facts as to the receipt of the Confederate money by Brinkley, while she disapproved of it, was offended at it even, yet she does not refuse to have anything to do with the money, and require him to tender it back to the purchaser, but directs him to take it south, and do the best he cordd with it. Was not this an assumption of control over it as her money, and that with full and complete knowledge of all the facts of fraud? Did she know then, as much as she knew when her bill was filed, as to the facts? The only thing she has learned since is, that the money, after three or four years, has grown to be worthless; but the fraud, and all the facts on which she seeks a rescission were before then as well known as at any subsequent time.
The bill itself charges that she did. not receive the money, but repudiated the action of her agent. This allegation, we do not think, is sustained by the facts *640 in the case, unless we hold the expressions of dissatisfaction made by her to her own agent, Mr. Brinkley, shall be held a repudiation of the contract as to the defendant Johnson, when there is nothing to show he ever heard of it, and the answer on oath expressly denies that she ever repudiated the trade till the filing of this bill. It is true she called on him with the $10,000 note for payment, and, because not settled satisfactorily, she spoke of repudiating it; but this, it seems to us, was a direct affirmation of the contract, and only a threat of repudiation, but not an act of dis-affirmance upon any fair construction of • it, unless we hold that demanding the consideration-money, and talking of repudiating the contract, probably to compel its payment, is a repudiation and disaffirmance.
But, further, Brinkley loaned the money out in Alabama, perhaps, except $2,000. Was not this fairly in pursuance of the authority given him by Miss Scott, when she told him to take it south and do the best he could with it? As between her and her agent, Brinkley, if she had sought to make him liable to account for the money, might he not well have said, I have loaned the money in pursuance of your directions, and have done the best I could with it; and could she have been heard to say, you had no authority to loan it? I think not, clearly. If so, then she has loaned the money out, thus using it as her own, ratifying the act oí her agent in receiving it, in the most emphatic manner, by making the ordinary use of the money to which it was adapted.
Still further, Brinkley was paid a debt she owed *641 him, and one to Jno. M. Lea, amounting to $'2,000, I believe. Does any one suppose she means to pay these debts over again, or that she has ever repudiated this benefit received by her from the money? The record does not show it at any rate; and if the fact was that way, she could have shown it. On the contrary, should we decree in her favor, would she not be bound to be charged with this amount, -because it has paid her debts? If so, on what principle can there be a ratification in part and repudiation in part of an entire transaction.
Mr. Story, in his work on Agency, s. 250, lays it down that “a principal can not ratify a transaction in part and repudiate it as to the rest. He must either adopt the whole or none; and a ratification once deliberately made, upon full knowledge of all the material circumstances, can not afterward be revoked or recalled.”
In addition to all this, there was a note of vendee taken for a balance of purchase-money. The vendor called on Mr. Brinkley, on her way to Tennessee, perhaps for that purpose, thus asserting her right to it as her property. See proof of B. as to this point. If she intended to repudiate the transaction, the note was in the hands of Brinkley, who had wrongfully received it, and she ought to have let it remain there. But does not this show that she had not only acquiesced in the act of her agent, after ample time for reflection, but that she considered the note as her own, and prepared to take possession of it as such.
It is well laid down by Mr. Story, there is no *642 necessity that there should be any positive or direct confirmation of the act of agent in order to make a ratification — sec. 255 — as in case where an agent took a demand for collection, and received in payment bills of a bank, the solvency of which he did not know, and took the guaranty of the debtor, with surety, that the bills were good, and upon making his conduct known • to his principal, the latter received the money and guaranty, saying he would see what could be done with the money, and he kept the money two or three months before he ascertained its value, when the bills proved to have been worth only twenty cents on the dollar, it was held a ratification.
The case before us seems to' me a stronger case than the one given by Mr. Story. Here the party, whose agent took the' Confederate money, has in fact had the money carried to another State. It has been there loaned out, as I assume, in pursuance of her authority, and no doubt with her knowledge, by her agent and confidential friend, Mr. Brinkley; a part of it has paid her debts, $2,000, and no tender of the money back or rescission of the contract attempted for about four years, and then this bill is filed. We think if this does not amount to ratification, nothing short of a deed or other solemn instrument could have that effect.
In addition to all this, she certainly recognized the note given for balance as her’s, when she called at Mr. Brinkley’s to get it for collection, as he supposed. When she called on Mr. Brinkley for the note she gets it, as he understands, for collection; and as is *643 argued, slie calls on Johnson for payment; then it shows Mr. Brinkley was correct as to her purpose; and in execution of that purpose she asserted her right to the money on this note, by demanding it, and by this act necessarily affirmed the contract, and recognized its existence up to that time; for if she repudiated it, then she had no right to collect the note. She could not affirm and disaffirm at the same time — claim the money for the land, and then claim the land too. We can not see how, under well-settled rules, this is not to be held a ratification of the contract.
Now let us assume that the Confederacy had succeeded, and the money not have proven worthless, could the complainant in any Court have had a decree for rescission, based on the original fraud in paying Confederate money to her agent, Mr. Brinkley? We think not. Has she not then held on to this money, and speculated on the chances of the notes being good or proving worthless, for about four years? and now seeks relief over all this, on the ground of the original fraud, which we think has long since been ■waived, and the act of the agent ratified, not alone by acquiescence, but by positive affirmative acts, with as full knowledge of the fraud during all the four years, as she had when the bill was filed.
In the case of Walker v. Walker, decided at this term, where an agent for the collection of money in Tennessee was directed by his principal to send it to him in North Carolina by express, but in violation of his instructions he invested the monev in a check *644 on New York, drawn by a solvent party at the time, and sent the check to the principal. The drawer of the check broke, and the check proved worthless. When the check was received by principal, he forwarded it to New York for collection, not knowing of the failure of the drawer. A majority of the Court held, that this was not a ratification of the act oí the agent in sending the check instead of the money, because he did not know the fact that the check was worthless when he sent it; and not having full knowledge of all the facts necessary to form an opinion, or for intelligent action, he was not bound by the act of sending the check. Two of the Judges of this Court held, even in that case, that the act of sending the check to New York, even in ignorance of the fact .that it was worthless, was a ratification of the act of the agent.
Now let us apply the principle in the above case to the one in hand. Brinkley was not authorized to receive Confederate money. When he told her he had received it, she had a right to refuse it, repudiate the payment and rescind the contract. She was bound to do this in a reasonable time, all the circumstances considered. She could have done it at once. The parties lived at the time in the same city, there was no difficulty in the way of prompt repudiation of the act of her agent. Instead of this, she expressed her dissatisfaction at what was done; but then, instead of rejecting and repudiating it, as we construe her conduct, she, with full knowledge of all the fraud and violation of her orders, adopts the act of her agent, *645 and tells him to take the money south — not back to the party paying it — and do the best he could with it, and •allows him to retain and take the $10,000 note south with him. What more could she have done in the way of adopting and ratifying the act if it had been paid in Tennessee money ? Could she have done more with it, than to have done the best that could be done? In other words, invest it to the best advantage, for that is the plain meaning of her language. Suppose Southern bank currency had been received by her agent, and she had directed him to take it south and do the best he could with it, would this suit have been brought, even though the parties had promised to pay her in the notes of the best banks of the State of Tennessee? We think not. Can the question of ratification in any way be made to depend on the kind of money received, or does it not depend upon assent given to an act done by an agent, with full knowledge of all the facts on which that assent might be expected to depend, and stand on precisely the same principle in case of receipt of Confederate money, as in receipt of anything else, which the agent was not authorized to receive ?
In cases of fraud, Mr. Addison in his work on Contracts, pp. 148, 149, lays down the rule as follows: “Whenever one party of two parties to a contract has obtained money from the other by fraud or deceit, an action may of course be maintained by the cheated party for the recovery of the money so paid. But the latter must promptly repudiate the contract as soon as he discovers the fraud. If a purchaser has been *646 induced to buy goods in consequence of a fraudulent representation made by the vendor, he must repudiate the contract and return the goods as soon as he is aware of the. deceit. If he keeps the goods, or resells them, he can only sue the vendor for a breach of warranty. We can not see why this principle is not as applicable to the case of a seller as a purchaser.” Again, in reference to ratification of a contract, he says, p. 622: “If a bill or note be signed without authority by A’s servant or agent in the name of A, a subsequent promise by the latter to pay the bill is equivalent to a prior authority, and if the proceeds of such bill be applied to A’s use or for his benefit, with his knowledge or concurrence, such application of the money obtained upon the bill would, of itself, amount to a subsequent ratification and sanction of the act of the agent.”
Mr. Story, in his work on .Contracts, vol. 1, s. 497, lays down the rule, “that it is solely at the option of the party upon whom the fraud is practiced whether he will be bound by the agreement or not. Yet if he determines to avoid a contract because of the fraud, he must give notice of such determination to the party within a reasonable time after his discovery of the fraud; and if, with knowledge of the fraud, he acquiesce in the contract expressly, or bring an action on the contract, or do any act importing an intention to stand by it, or remain silent under circumstances which plainly indicate a continuing assent thereto, he can not afterward avoid it; for practically no man is injured, if he know the deceit which is practiced and consents *647 to it, since the deceit tlien becomes an agreed fact- of the case.”
We can not see how, consistent with these well-established principles, which we. have approved in the case of Hamilton v. Saunders, we can grant the complainant the relief sought. She has, with knowledge of the deceit and fraud, acquiesced in the application of $2,000 of the money to her own use in payment of her debt — no doubt knew of the loan of the. money in the south, and so far as we can see in this case, never notified the purchaser of disaffirmance or dissatisfaction, till this bill is filed — only complained to her agent, was dissatisfied, hut did not promptly repudiate, but by her conduct waited and took the chances of the result of the war, before she disaffirmed the contract, and only seeks to do so after the money or notes have become worthless, and the party to whom it was loaned failed to pay it back to her.'
As to the argument from circumstances of country, and influence of military orders, it is all answered by the fact, that she did not hesitate to make the contract, in which she refused to take Confederate money, and we can not think that the fear of military orders had any influence on her subsequent conduct. In fact the true construction of her conduct is, that she was dissatisfied at Mr. Brinkley at his receiving Confederate money, but this was not deemed by her as so serious a matter as to defeat the trade she had made, and while she much preferred funds of a different kind, yet having got this, she perhaps fretted a little at it, but subsided into a not simply passive acquies *648 cence, but actively adopts and ratifies tbe act, by directing Avhat to do with tbe money;' and he did no' doubt as he understood was desired, by taking the money south and loaning it out.
An additional fact, that I think is conclusive of the case, that is, that she recognized the note for balance as hers, and presented it for payment; but when confronted with her own note, she refused to take it up in the settlement. The fact that she called on Brinkley for the $10,000 note, in 1863, to get it for collection, we think conclusively makes a case of ratification, and that a year, perhaps, after the trade, from which we infer she had done what Brinkley supposed she would do, that is, acquiesced in what had been done for her by him.
The case of Scott v. Buchanan, 11 Hum., 468, is cited to support the view of this case taken by a majority of the Court. On looking into that case, it will be found to lay down the precise principle which we maintain" in this opinion. The Circuit Judge charged in that case — which was the case of a deed made by an infant — as to express ratification, “that to-make the deed good by such ratification, the party must not only have agreed to it after she became of age, but at the time she so "agreed to it, must have known that she had a right to disaffirm it if she saw fit to do so.” That ratification — that is express — means “to confirm an act not before binding, making it good, agreeing to or adopting it.” This is all. very well as to express ratification, .or ratification by contract, and that by one who was an infant when the act was *649 done, but bas no application to cases of implied ratification on the part of persons sui juris, who are presumed to know their rights. But the Court in that case also charged the jury, that the deed might be ratified, not only by express ratification, but by doing acts which reasonably imply an affirmation, or by omitting to disaffirm the deed in a reasonable time after the party comes of age.
The Court say, in conclusion of opinion in that case, p. 477, that these instructions conform substantially to the opinion of the Court, and were not erroneous, and that, while there was no proof of an express ratification, yet refuse to disturb the verdict on the ground of the delay of the infant in that case to disaffirm the deed. The maker of the deed had delayed a little upwards' of two years to bring suit, or disaffirm the deed, after the removal of disability of coverture, and it was held to bind her.
But we may dispose of this case, as well as case of Wheaton v. East, 5 Yerg., 62, by saying that both were cases of an infant’s deed, one under disability by reason of want of age at the time of making them, and have no application either upon principle or authority to a case like this. Here the party seeking relief was not only free from all disability, but was competent to contract, and did contract to sell, and did convey the land — all done freely and voluntarily. There is no question of this. The only question is, did she in like manner acquiesce in, and either expressly or by fair implication ratify the act of her agent in receipt of the Confederate money for the land?
*650 She assumed control of it by directing it to be taken south, “and the best that could be done with it, to be done.” She also affirmed the act by receiving the ■ note, or rather calling for it, at Canton, and afterward demanding its payment.
Hence we can not see the force of the reasoning, that concludes that as she demanded the money, and spoke of repudiating the whole contract if it was not paid, that she thereby repudiated the contract. Then it must have been an affirmative in one breath and repudiation in the next; and there can be no principle better settled, that a party when he once completes the act, can not take it back, but must stand by it. She affirmed by the demand of the money; the act is unequivocal, can mean nothing else. She threatened to repudiate, and this is held by the majority opinion to be a disaffirmance. This seems to me to he straining the facts for-a conclusion to a most unwarrantable length, and one to which I can not assent.
Again, it is maintained that she did not know her rights. Assume that -such knowledge — that is, knowledge of the law of the case — is necessary in such case (which I utterly deny), then the law presumes she did know the law in the first place. In the second place, it must be gratuitously assumed that she did not know them, for there is certainly no proof to sustain it, and if such rule be adopted, how can it ever be shown that the law of the case was known by the party? "Who can prove that Miss Scott knew the law in case of fraud of this kind alleged in the ' bill ? By what means could the defendant have shown it, or how *651 could she have rebutted the proof, if any had been presented tending to show that she did know the legal rights arising out of the transaction? Such a rule would be impracticable if adopted, and is in violation of every sound principle of the law, as we understand it.
But further, it does appear in the clearest manner, that she did know her rights, for when she demanded her money,, she threatened to repudiate the whole contract; and that she had the right to do so, and that her view of the case was the correct one, is just held by a majority of this court; so that in fact, the record in its facts meets the very ground, and shows it to be totally unfounded, on which she is in the opinion relieved. She certainly then affirmed the contract when she made demand of the money. She certainly understood her rights as expounded in the opinion, when she proposed to repudiate the whole contract. Now we ask, did she gain the knowledge of her rights immediately after the demand, or are we arbitrarily to assume, with no proof, that she was ignorant of the effect of her affirmation, however clearly she seemed to understand her right to repudiate?
The question we do not think admits of argument, and with this deep conviction, we - can not but enter our dissent to the views of the opinion of the majority of the Court.
In case of an infant, who makes a contract which he may avoid in coming of age, long aequiesence even would be evidence of ratification, but if such infant were to do as many and as unequivocal acts of ratifi *652 cation as is shown in this case, it would be conclusive on him, and bind him irrevocably. Much more ought a party who is free from all disability, either of infancy or coverture, be held bound under like circumstances.
In a word, if the facts in this record do not estop the party from relief, and bind her as a ratification, then I can conceive of no case where a ratification can be made of acts of agent, except by express deed, and we will have to set aside, as not a part of our law, all that class of cases that make a ratification by acquiescence, and failure of party to repudiate the contract of the agent, on coming to a knowledge of all the facts and circumstances of the case. This we do not think can be done.
In a word, we think, so far from there having been a prompt repudiation of the contract of agent, or his act, there was a prompt acquiescence in it, followed by unequivocal acts, which the law has always held amounted to a ratification, and by which she is bound. These general rules may operate harshly in some cases, but they are founded on sound principle, and the law can not be made to bend in order to meet hard cases. All must be governed by the same prescribed rules, and none can be exempted from this operation, without rendering the law uncertain, and fluctuating to meet cases, rather than a fixed rule of action prescribed alike to all, and besides introducing infinite confusion.